UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| T. PRIBBLE[1], | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 3:22-cv-02430-GCS |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM & ORDER

**SISON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits ("DIB") pursuant to 42 U.S.C. § 423.

PROCEDURAL HISTORY

Plaintiff applied for DIB on May 5, 2020, alleging disability as of January 9, 2020. (Tr. 171-174). Plaintiff was initially denied DIB on July 31, 2020. (Tr. 75-81). He was also denied DIB upon reconsideration on July 13, 2021. (Tr. 83-97). Plaintiff then requested a hearing on August 2, 2021. (Tr. 111-112). The Administrative Law Judge ("ALJ") conducted a telephonic hearing on November 2, 2021. (Tr. 40- 74). On November 17, 2021, the ALJ issued a decision finding Plaintiff "not disabled" and denying him benefits. *Id.* at (Tr. 10-34). The Appeals Council denied review of the ALJ's decision on August 22, 2022.

---

[1]    Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* FED. R. CIV. PROC. 5.2(c) and the Advisory Committee Notes thereto.

(Tr. 1-3). This resulted in the ALJ's decision becoming the final decision of the Commissioner, making it final and appealable. *Id.* Plaintiff then filed the present action pursuant to 42 U.S.C. § 405(g) on October 19, 2022. (Doc. 1).

**ISSUES RAISED BY PLAINTIFF**

Plaintiff raises the following issues:

I.      The ALJ's Residual Functional Capacity ("RFC") finding violated Social Security Regulation ("SSR") 96-8p and was not supported by substantial evidence.

II.      The ALJ's evaluation of Plaintiff's symptoms violated SSR 16-3p and was not supported by substantial evidence.

**APPLICABLE LEGAL STANDARDS**

To qualify for DIB and SSI, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform

his or her former occupation? and (5) Is the plaintiff unable to perform any other work? *See* 20 C.F.R. § 404.1520.

An affirmative answer at either step three or step five leads to a finding that the plaintiff is disabled. A negative answer at any step, other than at step three, precludes a finding of disability. The plaintiff bears the burden of proof at steps one through four. Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show the plaintiff's ability to engage in other work existing in significant numbers in the national economy. *See Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

The scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *See Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *See Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). While judicial review is deferential, it is not

abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

### THE DECISION OF THE ALJ

The ALJ followed the five-step analysis detailed above. He determined that Plaintiff had not worked at a level of substantial gainful activity since the alleged onset date of January 9, 2020.[2] (Tr. 15). The ALJ found that Plaintiff "had the following severe impairments: bilateral femoral head avascular necrosis; asthma, obstructive ventilatory defect, and allergic rhinitis; liver steatosis; idiopathic thrombocytopenic purpura; dermatitis; eczema, and tinea cruris; type 2 diabetes mellitus; psoriasis; common variable immunodeficiency; and level two obesity." (Tr. 15-16). Plaintiff's major depressive disorder, anxiety, and attention deficit hyperactivity were found to be non-severe impairments. (Tr. 16.)

In determining Plaintiff's Residual Functional Capacity ("RFC"), the ALJ found that Plaintiff could "perform sedentary work as defined in 20 C.F.R. § 404.1567(a). Specifically, he can lift, carry, push, and pull ten pounds occasionally and less than ten pounds frequently. He can sit (with normal breaks) for a total of six hours in an eight-hour workday. He can stand and/or walk (with normal breaks) for a total of two hours in an eight-hour workday. He can frequently handle and perform fine finger manipulation with the bilateral upper extremities." (Tr. 20). As such, the ALJ denied

---

[2]      The claimant worked after the alleged disability onset date, but the activity did not rise to the level of substantial gainful activity. Plaintiff's earnings during the second quarter of 2020 were below the 2020 presumptive substantial gainful activity levels of $1,260 per month. The additional income during this period derived from the settlement of a lawsuit against a former employer for wrongful termination. (Tr. 15).

Plaintiff at step five and determined that he could perform the sedentary occupations of cuff folder, table worker, and addressing clerk. (Tr. 34).

**THE EVIDENTIARY RECORD**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by Plaintiff.

**A.    *Evidentiary Hearing***

Plaintiff was represented by an attorney at the hearing on November 2, 2021. The ALJ began the hearing by conducting an examination of Plaintiff. The ALJ questioned Plaintiff on a variety of background issues including his marital status, number of dependent children in the household, and his income in 2020 to ascertain whether Plaintiff's work amounted to gainful activity. (Tr. 46-48). The ALJ also reviewed Plaintiff's prior employment history from 2010 to 2020. (Tr. 49-54).

Plaintiff's attorney then examined Plaintiff. (Tr. 54). The attorney queried Plaintiff on his biophysical profile – including his height and weight. *Id.* Plaintiff reported that he is six feet tall, 250 lbs., and right-handed. (Tr. 54). The attorney also asked Plaintiff why he stopped working at his most recent employer – Wisconsin Physician Services. (Tr. 55). Plaintiff indicated that he was terminated because he was missing "one to two" days per week of work because of his "chronic variable immunodeficiencies ("CVID"), ITP [immune thrombocytopenic purpura], irritable bowel syndrome ("IBS") . . . avascular necrosis, arthritis, and severe psoriasis." (Tr. 55).

The attorney then inquired how each of these conditions impacted Plaintiff's daily

Page 5 of 17

life. Plaintiff reported that his ITP "creates severe fatigue as well as severe malaise." (Tr. 55). Plaintiff noted that he "cannot go without sleeping between twelve to fifteen hours a day." (Tr. 55). Plaintiff stated that his treatment for ITP includes weekly subcutaneous home infusion therapy. (Tr. 56). Treatment takes between three and five hours. (Tr. 57). Plaintiff reportedly experiences "dehydration with extreme fatigue, malaise, joint pain and stiffness" after the infusions. (Tr. 56). These infusions also serve as a treatment for Plaintiff's CVID. (Tr. 56).

Plaintiff stated that CVID causes his body "not [to] make an immune system." (Tr. 56). Plaintiff reported that his lack of immune system "limits [his] daily activity being in public [and] being around people." (Tr. 56-57). Plaintiff noted that he had his infusion treatment the day prior and that "if [he] didn't have to be here [for the hearing] . . . , [he] would probably be at home in bed. It creates to the point where [he] can't move and getting [his] daughter to school in the morning after [his] infusions is almost too much for [him] to do."(Tr. 57). Because he lacks an immune system, Plaintiff gets sick often, "anytime the weather changes." *Id.* Particularly, Plaintiff noted that sinus infections "completely obliterate" him and "wreck [his] body." (Tr. 57).

Plaintiff's IBS reportedly impacts him most in the mornings. (Tr. 57). He noted that he usually gets up between an hour to two hours earlier than normal because he spends about "30, 45 minutes to over an hour" in the bathroom before he takes his daughter to school. (Tr. 57). Plaintiff indicated that his IBS affected his prior employment because he had to "take time away from the phones to be in the bathroom." (Tr. 57).

Regarding Plaintiff's connective tissue disorders, Plaintiff noted that he has been

diagnosed with "spondylitis, which is inflammatory arthritis and psoriatic arthritis." (Tr. 58). Plaintiff reported that his "joints, ligaments, knees, hips, back, wrists, elbows, feet and ankles" are impacted. (Tr. 58). These disorders prevent Plaintiff from doing "any type of manual labor" in his home. (Tr. 58). Plaintiff stated that he cannot "really do any of the household duties as far as cooking, cleaning, things like that because most mornings if [he] can get up and walk normally within the first thirty minutes, [he] considers it a blessing because most times when [he] wakes up, [he] cannot walk well." (Tr. 58). Additionally, Plaintiff's father and brother-in-law handle the yard work. *Id.* Plaintiff reported that treatment for these conditions is difficult because he cannot take certain anti-inflammatory drugs as they may cause further damage to his liver. (Tr. 59).

Avascular necrosis is present in both of Plaintiff's hips. (Tr. 59). Plaintiff reported that this condition "makes [him] almost immobile at times to where in the mornings when [he] get[s] up . . . [his] hips do not want to allow [his] legs to move, and then between that and the inflammation and the swelling that [he] get[s] in [his] side and hips." (Tr. 59). Plaintiff stated that he does not presently use a cane or assistive walking device. *Id.* At the time of the hearing, Plaintiff stated that his doctors did not recommend surgery because of the COVID-19 pandemic. (Tr. 60). Plaintiff indicated that he could sit and stand for twenty-five to thirty minutes at a time. (Tr. 60). However, Plaintiff does not believe he could rotate between sitting and standing to complete an eight-hour workday. (Tr. 60). This is because after thirty minutes of sitting, standing becomes too painful. (Tr. 60-61).

Plaintiff's psoriatic arthritis affects his hands. (Tr. 61). Plaintiff indicated that the

arthritis impacts his dominant hand at times, and the condition causes his hands to swell

two to three times a week. (Tr. 61). Plaintiff recalled that there is no rhyme or reason for

the flare-ups. (Tr. 61).

Plaintiff then recounted his typical daily activities as follows:

> Typical day for me is to get up, struggle to get out of bed, then I will
> basically go to the bathroom. Then I make my way to my couch. I will
> attempt some days, depending on how I'm feeling in the morning, if I'm
> able to attempt to help my wife get my daughter dressed for school, get
> breakfast made. Unfortunately, due to my wife's work schedule[], once my
> daughter is dressed, I will take her to school, and that's about the only time
> I drive really during the day. Due to all my health issues, I do not drive
> anymore unless absolutely necessary. I will take her to school and most
> mornings, just doing that, just taking her to school and dropping her off is
> enough that I will come back home and usually nap for two, three hours,
> especially after my infusions.

(Tr. 62). Plaintiff also indicated that he is unable to do housework and chores, but he tries

to fold laundry when his hands will allow. (Tr. 63). He does not "do anything social"

anymore because of "his issues." (Tr. 63). Plaintiff was previously very active with his

church and his daughter's softball team. (Tr. 63). However, he has resigned from

participating in these activities. (Tr. 63).

The ALJ then questioned the vocational expert ("VE") – Mr. Matthew Lampley.

(Tr-68-74). The ALJ posed the following hypothetical set of limitations to the VE:

> If you assume a hypothetical person in the younger age category who has
> at least a high school education, shares the past work experience. If the
> individual has the ability to lift, carry, push, pull ten pounds occasionally
> and less than ten pounds frequently; to sit with normal breaks for a total of
> six hours in an eight-hour workday; to stand and/or walk with normal
> breaks for a total of two hours in an eight-hour workday, if you assume this
> individual could frequently handle and perform fine finger manipulation
> with the bilateral upper extremities; should have no exposure to weather .

. . based on immuno compromise . . . If you assume the individual could tolerate occasional contact with coworkers and supervisors but should have no contact with the public. With this combination of limitations would there be any sedentary unskilled occupations such a hypothetical person could perform?

(Tr. 68-69). In response, the VE indicated that all past relevant work would be precluded. (Tr. 70). However, he noted that the individual would be able to work as a Cuff folder, 685.687-014, SVP: 2, sedentary, 12,000 jobs nationally; Table worker, 739.687-182, SVP: 2, sedentary, 21,000 jobs nationally; or as an addressing clerk, 209.587-010, SVP: 2, sedentary, 14,000 jobs nationally. (Tr. 70).

The ALJ then included additional hypotheticals with further limitations. First, the ALJ noted that if an individual were limited to working 4 hours per day, employment would be precluded under the SSR. (Tr. 70). The ALJ then asked whether an individual could be employable with the aforementioned limitations, plus the additional limitation of only occasionally being able to perform "fine finger manipulation with the bilateral upper extremities." (Tr. 70-71). The VE indicated that such an individual would not be employable. (Tr. 71). The VE also indicated that an individual who was absent three days per month would be unemployable. (Tr. 71-72).

Lastly, Plaintiff's attorney made a brief concluding argument asserting that Plaintiff met the standards of SSR 14.07C concerning immune deficiency disorders. Plaintiff's attorney argued that such standards were met because Plaintiff had severe fatigue and malaise, which limited his activities of daily living. (Tr. 72-73).

B.     *Relevant Medical Records*

Plaintiff contends that three pieces of medical evidence were not properly taken

into consideration by the ALJ.

First, Plaintiff alleges that the medical opinions of Dr. Tiffany Biason Dy were not properly considered. (Doc. 21, p. 10-13). Dr. Biason Dy submitted two medical opinions addressing Plaintiff's conditions.

Dy's first "Medical Opinion" dated September 22, 2020, stated that Plaintiff is followed in Washington University's Allergy and Immunology practice for an immunodeficiency diagnosis of Common Variable Immunodeficiency ("CVID"). (Tr. 737). Dr. Dy noted that this condition predisposes Plaintiff to recurrent infections and that he is currently being treated at home with Hizentra subcutaneously. *Id.* Dy also noted that patients with this condition may have autoimmunity; Dy also noted that Plaintiff has psoriasis. *Id.* She further explained that chronic inflammation from infection and autoimmunity may contribute to symptoms of chronic fatigue, which Plaintiff has experienced. *Id.*

Dy's second Medical Opinion dated August 20, 2021, states that she believes Plaintiff qualifies for disability because of the symptoms he experiences in conjunction with his treatment for CVID. (Tr. 859). Dy stated that Plaintiff suffers from avascular necrosis, hepatic fibrosis, diabetes type 2, and severe psoriasis. *Id.* She reported that Plaintiff is "experiencing significant fatigue despite sleeping up to 15 hours per day" and has "malaise associated with arthralgias (joint pain and stiffness)." *Id.* Dy opined that these symptoms have resulted in limitations to plaintiff's activities of daily living, including housework. *Id.* She reported that Plaintiff's wife is performing all household duties and that he is unable to drive. *Id.*

Second, Plaintiff alleges the function-by-function opinion from Kristen Richardson NP-C dated October 22, 2021, was not fully considered by the ALJ. (Doc. 21, p. 12-13). Richardson indicated that Plaintiff was diagnosed with psoriatic arthritis, with a history of joint pain, joint tenderness, morning stiffness, and radiographic changes typical of inflammatory arthritis. (Tr. 945). Upon the most recent examination, inflammation was found to be present in his left hand, left shoulder, right hand, right shoulder, left knee, right knee, and spine. *Id.* She also noted that Plaintiff had moderate extra-articular manifestations of inflammatory arthritis on his skin. (Tr. 246). Plaintiff reportedly also experienced significant fatigue. *Id.* Richardson determined that these symptoms had a moderate impact on plaintiff's activities of daily living, maintenance of social functions, and his ability to complete tasks in a timely manner due to deficiencies in concentration, persistence, or pace. *Id.*

Richardson further opined that Plaintiff could stand or sit for only 30 minutes at a time. (Tr. 947). She also believed that Plaintiff was only capable of working 4 hours per day, lifting 10 pounds on an occasional basis, and lifting 5 pounds on a frequent basis. *Id.* She also found that Plaintiff could occasionally bend, stoop, engage in fine manipulation of his left and right hands, engage in gross manipulation of his left and right hands, and raise his left and right arms above shoulder level. (Tr. 947).

DISCUSSION

I.    **The ALJ's Residual Functional Capacity ("RFC") finding violated Social Security Regulation ("SSR") 96-8p and was not supported by substantial evidence.**

Plaintiff asserts that the ALJ's RFC determination failed to meet the standard contained in SSR 96-8p, which requires the ALJ's RFC to "include narrative discussions describing how the evidence supports each conclusion, citing to specific medical facts (*e.g.*, laboratory findings) and nonmedical evidence (*e.g.*, daily activities, observations)." Specifically, Plaintiff asserts that the ALJ erred by failing to consider the medical opinions of Dr. Tiffany Biason Dy and Kristen Richardson-NP-C when evaluating Plaintiff's complaints of fatigue. Moreover, Plaintiff points out that these opinions were not reviewed by the state agency medical experts, which ultimately found that Plaintiff had no severe impairments. Plaintiff thus argues that the ALJ's RFC determination of "sedentary work", with frequent handling/fingering and no mental restrictions, was not based on any medical expert support and left an evidentiary deficit. Ultimately, the Court agrees with Plaintiff's assessment.

"When the record contains significant, new and potentially decisive findings", such as the case here with Plaintiff's treating physicians indicating worsening symptoms associated with Plaintiff's CVID and ITP, an ALJ should consult a physician to ascertain the significance of those findings. *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016). *See also Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (remanding where the ALJ uncritically accepted vague non-examining physicians report and failed to submit new MRI to medical scrutiny, which "she should have since it was new and potentially decisive

medical evidence."). Instead of consulting the state reviewing physicians, the ALJ in this instance decided that neither Dr. Dy's nor Nurse Richardson's opinion was persuasive; thus, neither opinion impacted the RFC determination. (Tr. 31).

The ALJ correctly discounted Dr. Dy's first opinion because it "described no functional limitations" and therefore did not constitute a medical opinion. *Amy O. v. Kijakazi*, No. 21-cv-2416, 2022 WL 16696266, at *2 (N.D. Ill. Nov. 3, 2022) (stating that "[n]or is it considered a "medical opinion", because it does not provide specifics as to any functional limitations . . ."). As to Dy's second opinion, the ALJ found the opinion unpersuasive because it was inconsistent with the existing record documenting Plaintiff's fatigue. (Tr. 31). While this may be true, the fatigue was consistently noted in Plaintiff's specialist records and is considered a common side effect for those undergoing treatment with infusions of Hizentra.[3] *See, e.g.*, (Tr. 843) (noting that Plaintiff experiences "chronic fatigue. He reported that there are days when he must return to bed for 4-5 hours, despite having slept well on the previous night."); (Tr. 365) (reporting "fatigue and increased sleepiness."); (Tr. 371) (reporting that Plaintiff has experienced "increased fatigue."); (Tr. 384) (noting that Plaintiff's most active issue was "fatigue and psoriasis."); (Tr. 402) (noting Plaintiff reportedly was experiencing "worsening weakness, fatigue and intermittent mild abdominal pain" that prompted him to present for care at Southern Illinois Healthcare); (Tr. 446) (indicating that Plaintiff had "developed severe fatigue,

---

[3]    *See, e.g.*, *Elizabeth A.T. v. Kijakazi*, Case No. 4:20-cv-00224-TWP-DML, 2022 WL 526515, at *3 (S.D. Ind. Feb. 2, 2022) (indicating that physician interrogatory noted that Plaintiff's complaints that the medication Hizentra left her with very low ability to function for at least one day after each infusion – because of fatigue, arthralgias, headaches, and nausea).

weakness, shakiness and poor appetite."). Further, nothing in the record indicates that Plaintiff's dermatologist or general practitioner were tasked with managing Plaintiff's fatigue associated with his CVID or ITP. *See, e.g.*, *Dorian W. v. Berryhill*, No. 17 CV 50327, 2019 WL 1572560, at *3 (N.D. Ill. April 11, 2019) (rejecting a medical opinion based on an "isolated and misleading snapshot" prevents the record from reflecting a "fair longitudinal picture" of the claimant's conditions); *Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995) (noting that there would be no reason to expect a physician treating an eye condition, back pain, or urinary tract impairment to diagnose or look for depression). Additionally, there was no explanation of why the primary care visits purportedly documenting a lack of fatigue outweighed the presence of fatigue in the specialists' records. *See, e.g.*, *Zurawski v. Halter*, 245 F.3d 881, 888-889 (7th Cir. 2001) (finding that the ALJ must explain his or her decision to discount inconsistent evidence in the record). Accordingly, Dr. Dy's 2021 opinions characterizing Plaintiff's fatigue as chronic and having recently caused a limitation to Plaintiff's activities of daily living, should have been evaluated by medical experts.

The ALJ also dismissed Nurse Practitioner Kristen Richardson's medical opinion because she allegedly failed to build a "logical bridge" between her findings and medical evidence. (Tr. 31). Defendant argues that Richardson failed to build a "logical bridge" because she "did not cite to any objective medical evidence, findings on exam, or any other medical evidence in her report." (Doc. 27, p. 7). However, Plaintiff identified portions of the form where Richardson cited to medical evidence. (Doc. 21, p. 12). Specifically, Richardson noted that Plaintiff had a history of joint pain, joint tenderness,

morning stiffness, and radiographic changes typical of inflammatory arthritis. (Tr. 945).

Richardson identified "significant fatigue" as one of the constitutional symptoms

associated with Plaintiff's condition. (Tr. 946). The Court makes no judgments as to the

strength of the evidence contained in Richardson's evaluation. *See, e.g., Larson v. Astrue*,

615 F.3d 744, 750-751 (7th Cir 2010) (noting that "[a]lthough by itself a check-box form

might be weak evidence, the form takes on greater significance when it is supported by

medical records."). However, given the potential significance of Richardson's findings

concerning Plaintiff's ability to engage in activities of daily living, the Court believes the

record should be evaluated by medical experts to ensure that the RFC determination is

appropriate.

**II.    The ALJ's evaluation of Plaintiff's symptoms violated SSR 16-3p and was not supported by substantial evidence.**

Plaintiff contends that the ALJ failed to properly consider his testimony indicating

that he has limited ability to use his hands due to flare-ups from psoriatic arthritis. (Doc.

21, p. 15). Defendant asserts that the ALJ properly considered Plaintiff's testimony to the

extent that Plaintiff's subjective statements were consistent with the record evidence in

accordance with Social Security Regulations. (Doc. 27, p. 9). The Court agrees with

Plaintiff that the ALJ's evaluation of Plaintiff's symptoms was not supported by

substantial evidence, as the ALJ conflated Plaintiff's long history of rashes and/or

psoriasis with his diagnosis of psoriatic arthritis.

Courts will overturn an ALJ's subjective symptom analysis only if it is "patently

wrong." *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017). "Patently wrong is a high

threshold – only when the ALJ's determination lacks any explanation or support . . . will [the court] declare it to be patently wrong and deserving of reversal." *Ray v. Saul*, No. 20-2802, 861 Fed. Appx. 102, 107 (7th Cir. June 30, 2021) (*citing Elder v. Astrue*, 529 F.3d 408, 413-414 (7th Cir. 2008)). Further, an ALJ is only required to give reasons sufficient to provide a fair sense of how he assessed a claimant's testimony and statements. An ALJ complies with this standard, and the court will affirm his findings, if he "gives specific reasons that are supported by the record." *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004). In cases where the medical evidence does not confirm the claimed symptoms, the ALJ considers a list of non-exhaustive factors, including: (1) daily activities; (2) location, duration, frequency and intensity of pain or other symptoms; (3) factors that precipitate and aggravate symptoms; (4) type, dosage, effectiveness, and the side effects of any medication taken to alleviate the pain or other symptoms; (5) treatment, other than medication; (6) any measures other than treatment an individual uses or has used to relieve pain or other symptoms; and (7) other relevant factors. *See* 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304, at *7-8.

Here, the ALJ mistakenly conflated Plaintiff's diagnosis of psoriatic arthritis with his long history of skin rashes. Thus, the ALJ failed to consider Plaintiff's testimony in the proper context, meeting the patently wrong standard. The ALJ recounts Plaintiff's history with rashes on his hands, associated with his autoimmune conditions. Plaintiff reported that he was diagnosed with psoriasis as a teenager, but then developed psoriatic arthritis a year and a half ago [in 2021]. (Tr. 23). This diagnosis was made by Nurse Practitioner Richardson. (Tr. 945). The diagnosis was also noted by Dr. Feinerman when

she examined Plaintiff. (Tr. 850). However, the ALJ only considered Plaintiff's psoriasis

when considering Plaintiff's hand limitations noting:

> The claimant's skin problems, in particular the rash on his hands, are well-documented in the record. The rash was initially diagnosed as dermatitis. In November 2020, Dr. Lehman diagnosed psoriasis and tinea cruris. He prescribed clotrimazole, and advised the claimant to keep the area dry, use petroleum jelly, and avoid scented products and hand sanitizers. Nevertheless, the record did not support the claimant's extreme allegations of functional limitation due to skin conditions. By July 2021, the tinea cruris was "resolved". Medical signs did not demonstrate any findings of swelling, decreased grip, or problems with manipulation (Hearing Testimony). Abnormal signs included the rash and, at one visit, some tenderness. Abnormal medical signs from older chart notes, when compared to the earnings records, show that even when the claimant presented with a rash, he was able to work at presumptive substantial gainful activity levels. His psoriasis improved after changing statin medications. He never told his medical sources the psoriasis was interfering with his ability to use the hands or fingers.

(Tr. 28). While the psoriasis itself might not be significantly impacting Plaintiff's hand

function, his psoriatic arthritis very well may be. Accordingly, the Court believes a direct

consideration of this recently diagnosed condition should be conducted.

## CONCLUSION

The Commissioner's final decision denying Plaintiff's application for social

security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for

rehearing and consideration of the evidence, pursuant to sentence four of 42 U.S.C. §

405(g).

**IT IS SO ORDERED.**

**DATED:  September 16, 2024.**

Digitally signed by Judge Sison
Date: 2024.09.16
15:41:01 -05'00'

**GILBERT C. SISON**
**United States Magistrate Judge**